IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION FILE NO. |
| v. | : | 3:21-cr-00006-TCB-RGV |
| | : | |
| KATRINA LAWSON, NIKIA | : | |
| WAKEFIELD, JAMES MCFARLAND, | : | |
| and INDIA MIDDLETON, *et al.* | : | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Katrina Lawson ("Lawson"), India Middleton ("Middleton"),

Nikia Wakefield ("Wakefield"), and James McFarland ("McFarland"), collectively

referred to as "defendants," are named along with six other co-defendants in a

fourteen-count superseding indictment that charges conspiracy to commit wire

fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. § 1343;

bank fraud, in violation of 18 U.S.C. § 1344; mail fraud, in violation of 18 U.S.C. §

1341; and money laundering, in violation of 18 U.S.C. §1957.   [Doc. 126].[1]

Middleton and Wakefield have filed motions for a bill of particulars, [Docs. 229 &

234], to which the government has filed a consolidated response in opposition,

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[Doc. 255]; Middleton, Wakefield, and McFarland have filed motions to sever, [Docs. 230, 232, & 239], to which the government has filed a consolidated response in opposition, [Doc. 254]; and Lawson has filed a motion to suppress cell phone evidence, [Doc. 221], and following an evidentiary hearing on her motion held on October 6, 2021,[2] Lawson filed a supplemental motion to suppress cell phone evidence, [Doc. 272], the government filed a response in opposition, [Doc. 281], and Lawson filed a reply in support of her motions, [Doc. 288].[3]  For the reasons that follow, Middleton and Wakefield's motions for a bill of particulars, [Docs. 229

---

[2] See [Doc. 275] for a transcript of the evidentiary hearing held on Lawson's motion to suppress, [Doc. 221], which will be referred to as "(Tr. at __)."  In addition, the government submitted an exhibit at the evidentiary hearing, which will be referred to as "(Gov't Ex. 1)."

[3] Wakefield, Middleton, and McFarland also filed motions to suppress statements. [Docs. 231, 235, & 238].  The Court conducted a pretrial conference in this case on September 9, 2021, see [Doc. 243], and granted defendants Wakefield and Middleton until September 16, 2021, "to perfect or withdraw their motions to suppress statements," and McFarland until September 23, 2021, "to perfect or withdraw his motion to suppress statements," [id. at 2 (citations omitted)]. Neither Wakefield, Middleton, nor McFarland have perfected their motions, [Docs. 231, 235, & 238], and they are deemed to have been abandoned, and the Clerk is **DIRECTED** to terminate these motions.   See United States v. Rodriguez–Alejandro, 664 F. Supp.2d 1320, 1327 n.3 (N.D. Ga. 2009) ("Defendant has not perfected the motion [to suppress], and it is deemed abandoned and withdrawn."); see also [Doc. 86 at 18 ("When a party fails to supplement or perfect a motion within the time afforded after having requested or been given an opportunity to supplement or perfect said motion, the Court may deem the original motion abandoned or withdrawn."); Doc. 165 at 18 (same)].

& 234], are **DENIED**, and it is **RECOMMENDED** that Middleton, Wakefield, and McFarland's motions to sever, [Docs. 230, 232, & 239], and Lawson's motion to suppress and supplemental motion to suppress cell phone evidence, [Docs. 221 & 272], be **DENIED**.

## I. INTRODUCTION

On March 16, 2021, a grand jury in the Northern District of Georgia returned an indictment against ten defendants that included charges of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. § 1343; bank fraud, in violation of 18 U.S.C. § 1344; mail fraud, in violation of 18 U.S.C. § 1341; and money laundering, in violation of 18 U.S.C. §1957, in connection with applications for funds made available through the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, including Economic Injury Disaster Loan ("EIDL") grants and loans under the Paycheck Protection Program ("PPP").  See [Doc. 1].  The grand jury subsequently returned a superseding indictment against the same ten defendants on April 20, 2021.  [Doc. 126].

The superseding indictment charges that on July 1, 2020, Lawson "sent a series of text messages from her cell phone number to defendant Alicia Quarterman [('Quarterman')] outlining a scheme to fraudulently obtain the EIDL Advance (*i.e.*, the $10,000 grant)."   [Id. at 5 ¶ 15 (all caps omitted)].  Lawson specifically told Quarterman that she had "another money maker for us and I'll do

your [sic] for free but get some people together and I'm charging $1000 per application." [Id. (internal marks omitted)]. Lawson explained to Quarterman through additional text messages "that EIDL Advance is a 'grant' that did not have to be paid back" and further told her that they were "going to charge $2000 for [her] to do the application, they will get 10,000 deposited in there [sic] account and they got to send [her] $2000 and [she would] split it with [Quarterman] for every person [Quarterman] g[o]t." [Id. at 5-6 ¶ 16 (internal marks omitted)]. Quarterman agreed and Lawson then advised her of "the type of information needed from each person for the EIDL application," and that same day, Quarterman provided Lawson with her information so that Lawson could submit a "fraudulent EIDL application" on her behalf. [Id. at 6 ¶¶ 16-17].

According to the superseding indictment, Quarterman then "contacted multiple people," including co-defendants Tranesha Quarterman ("T. Quarterman"); Wakefield; Adarin Jones, also known as Adrian Jones ("Jones"); Darryl Washington ("Washington"); McFarland; Katie Quarterman ("K. Quarterman"); and Middleton, "mostly via text message from her cell phone, and told them about the EIDL scheme, her 'fee,' and the needed personal information for the loan." [Id. at 6 ¶ 18]. Quarterman "also told several of these individuals that they could recruit their friends or family to participate in the scheme," and thereafter, T. Quarterman "recruited at least four individuals, Wakefield recruited

at least three individuals, Washington recruited at least two individuals, and Jones, McFarland, and K. Quarterman each recruited at least one individual." [Id. at 6 ¶ 19 (all caps omitted)].   T. Quarterman, Wakefield, Jones, Washington, McFarland, K. Quarterman, Middleton, and others would send their personal information via text message to Quarterman, who would then forward the information to Lawson to complete the online EIDL applications "by inputting false information for each applicant," which she then submitted to the Small Business Administration ("SBA").   [Id. at 7 ¶¶ 20-21].   Once she submitted the applications, Lawson then "took a screenshot of the EIDL application number and sent it via text message to Quarterman," who "then in turn sent the screenshot via text message to the co-conspirators, including but not limited to T. Quarterman, Wakefield, Jones, Washington, McFarland, K. Quarterman, and Middleton." [Id. at 7 ¶ 22 (all caps omitted)].   Once the individuals received the $10,000 EIDL Advance funds, they would pay Quarterman her "fee" from the proceeds "by cash, bank cashier's check, or mobile banking applications" and Quarterman would then split the money with Lawson "mostly by electronic banking means." [Id. at 7 ¶ 23 (internal marks omitted)].

The superseding indictment charges that "[o]verall, between July 1, 2020 and August 1, 2020, Quarterman sent Lawson the information for at least 48 different individuals for the purpose of submitting the fraudulent EIDL

applications"; that Lawson "completed approximately 58 fraudulent EIDL applications (because some applications were denied and Lawson re-submitted an additional application for the same person)"; that "[a]ll of these applications contained false information in order to qualify for the funds"; and that the SBA "accepted and paid out at least $185,500 on 19 EIDL applications submitted by Lawson on information given to her by Quarterman," with the "total amount sought through EIDL [being] at least $560,000."  [Id. at 8 ¶ 24 (all caps omitted)].

The superseding indictment also charges that on July 14, 2020, Lawson and Quarterman considered expanding "their scheme to include the PPP loans" and that Lawson sent Quarterman a text message on July 27, 2020, explaining how the program worked, including that "You can get up to 20,000 with the [PPP loans]" and that the "Loans are 100% forgivable if you follow the PPP loan forgiveness requirements issued by the [SBA]," and she then stated that the "fee to do the loan [would be] $6000, so you end up with $14000."  [Id. at 8 ¶ 25 (internal marks omitted)].  Subsequently, Quarterman "contacted many of the same individuals that she originally contacted for the EIDL scheme and told them about the PPP loan and the new information needed to apply" and the "new fee structure, including charging up to $10,000 for her share of the PPP loan because of the additional paperwork that had to be created," including "fraudulent Internal Revenue Service Forms 1040 Schedule C to show that the 'businesses' of the co-

conspirators made certain amounts." [Id. at 8-9 ¶ 26].   Thereafter, Quarterman "sent the information for 15 individuals to Lawson via text message, including but not limited to the information for herself, Wakefield, Middleton, and Montgomery, for the purposes of submitting fraudulent PPP loans to the SBA." [Id. at 9 ¶ 27 (all caps omitted)].   Lawson completed the online applications and submitted them and then notified Quarterman via text message that the PPP loan applications "were complete and tracked them to determine if and when they were approved," and once the PPP loan proceeds were received, the individuals, including Wakefield and Montgomery, then paid Quarterman  her "fee" from the PPP proceeds "in cash, bank cashier's check, or mobile banking applications."[4] [Id. at 9 ¶¶ 27-28 (internal marks omitted)].   Once Quarterman "received the 'fee' for the fraudulent PPP loans, she and Lawson divided up the money using electronic banking methods."   [Id. at 10 ¶ 29 (all caps omitted)].   Overall, "the SBA partner banks initially approved 11 of the fraudulent PPP loans submitted by Lawson using information sent to her by Quarterman" and these "financial institutions paid out at least $124,276 on six of the loans, as the additional five PPP loan applications were ultimately denied," with the "total amount sought for all of the

---

[4] Montgomery, who was recruited by Wakefield, "paid Quarterman by mailing a $10,000 check to her through the United States Postal Service on or about August 3, 2020."   [Doc. 126 at 9 ¶ 28 (all caps omitted)].

PPP applications submitted by Lawson [being] at least $224,172." [<u>Id.</u> at 10 ¶ 30 (all caps omitted)].

The superseding indictment charges in Count One that beginning on July 1, 2020, and continuing through August 30, 2020, the ten named defendants conspired to commit wire fraud, in violation of 18 U.S.C. § 1349. [<u>Id.</u> at 1-10 ¶¶ 1-30]. Count Two charges that on or about July 7, 2020, Lawson, Quarterman, and T. Quarterman, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [<u>id.</u> at 10-11 ¶¶ 31-32]; Count Three charges that on or about July 1, 2020, Lawson, Quarterman, and Wakefield, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [<u>id.</u> at 11 ¶¶ 33-34]; Count Four charges that on or about July 1, 2020, Lawson, Quarterman, and Washington, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [<u>id.</u> at 11-12 ¶¶ 35-36]; Count Five charges that on or about July 1, 2020, Lawson, Quarterman, and Jones, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [<u>id.</u> at 12-13 ¶¶ 37-38]; Count Six charges that on or about July 7, 2020, Lawson, Quarterman, and McFarland, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [<u>id.</u> at 13 ¶¶ 39-40]; Count Seven

charges that on or about July 1, 2020, Lawson, Quarterman, and K. Quarterman, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [id. at 13-14 ¶¶ 41-42]; Count Eight charges that on or about July 2, 2020, Lawson, Quarterman, and Middleton, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [id. at 14-15 ¶¶ 43-44]; and Count Nine charges that on or about July 27, 2020, Lawson, Quarterman, and Middleton, aided and abetted by one another, knowingly and unlawfully committed wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, [id. at 15 ¶¶ 45-46].

Count Ten of the superseding indictment charges that on or about July 30, 2020, Lawson, Quarterman, Wakefield, and Montgomery, aided and abetted by one another, knowingly and unlawfully committed bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, [id. at 15-16 ¶¶ 47-48], while Count Eleven charges that on or about the same day, Lawson, Quarterman, and T. Quarterman, aided and abetted by one another, knowingly and unlawfully committed bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, [id. at 16-17 ¶¶ 49-50].  Count Twelve charges that on or about August 3, 2020, Lawson, Quarterman, Wakefield, and Montgomery, aided and abetted by one another, knowingly and unlawfully committed mail fraud, in violation of 18 U.S.C. §§ 1341 and 2.  [Id. at 17-18 ¶¶ 51-52].  Finally, Count Thirteen charges that on or about August 3, 2020, Lawson

knowingly engaged and attempted to engage in money laundering, in violation of 18 U.S.C. § 1957, [id. at 18 ¶¶ 53-54], while Count Fourteen charges that on or about September 23, 2020, Quarterman knowingly engaged and attempted to engage in money laundering, in violation of 18 U.S.C. § 1957, [id. at 19 ¶¶ 55-56]. Defendants have filed several pretrial motions, [Docs. 221, 229, 230, 232, 234, 239, & 272], which are now fully briefed and ripe for ruling.

## II.  DISCUSSION

**A.**     **Motions for a Bill of Particulars, [Docs. 229 & 234]**

In their nearly identical motions for a bill of particulars, [Docs. 229 & 234], Middleton and Wakefield contend that the superseding indictment "alleges one large conspiracy among all defendants to commit wire fraud," but "then alleges 13 substantive counts outlining conduct specific to 1-4 individual defendants," while alleging that Quarterman and Lawson completed the fraudulent applications on behalf of the individuals who sent their information to Quarterman and that the other named co-defendants are only "alleged to have provided information to [] Quarterman to have received their own personal EIDL or PPP loan" and that because the "majority of the co-defendants communicated only with Quarterman," the superseding indictment "does not explain how each of the ten named defendants worked together to accomplish the single conspiracy charged in the [superseding] indictment," [Doc. 229 at 3 (citations omitted); Doc.

234 at 3]. Middleton and Wakefield therefore request the Court to "instruct the government to file a bill of particulars" that outlines the "object of the single conspiracy joined by all ten defendants" and the "means and manner by which each co-defendant conspired with the other named co-defendants to accomplish the object of the charged conspiracy." [Doc. 229 at 4; Doc. 234 at 3].

In its consolidated response opposing the motions, [Doc. 255], the government argues that the motions should be denied because "the information sought is already found within the superseding indictment," [id. at 3]. In particular, the government points out that the superseding indictment "clearly states the object of the conspiracy: that all of the defendants did conspire 'with each other and with others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses[.]'" [Id. at 3 (emphasis omitted) (quoting [Doc. 126 at 2 ¶ 1])]. It further points out that "there are 16 additional paragraphs that describe in detail the fraudulent scheme," and that the "manner and means . . . is sufficiently described within those same 16 paragraphs." [Id. (citation omitted)]. Finally, the government contends that the "law does not require that each co-conspirator actually know and directly 'work' with every other co-conspirator (as is implied by Wakefield and Middleton's manner and means request)" and that their request therefore "misstates the law

and seeks information that is not required for a jury to convict[.]"   [Id. at 4].

Accordingly, the government maintains that Middleton and Wakefield "have

ample information in order to properly prepare their defenses" and that "because

their request is legally flawed," the Court should deny their motions.   [Id. at 4-5].

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court

"may direct the government to file a bill of particulars."   Fed. R. Crim. P. 7(f).   "The

purpose of a true bill of particulars is threefold: 'to inform the defendant[s] of the

charge against [them] with sufficient precision to allow [them] to prepare [their]

defense, to minimize surprise at trial, and to enable [them] to plead double

jeopardy in the event of a later prosecution for the same offense.'"   United States

v. Reddy, Criminal Action File No. 1:09-CR-0483-ODE/AJB, 2010 WL 3210842, at

*5 (N.D. Ga. Apr. 5, 2010) (quoting United States v. Cole, 755 F.2d 748, 760 (11th

Cir. 1985)), adopted as modified by 2010 WL 3211029, at *7 (N.D. Ga. Aug. 11,

2010); see also United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)

(citations omitted); United States v. Zellner, Criminal Indictment No. 1:09-CR-320-

TCB-GGB, 2011 WL 530718, at *9 (N.D. Ga. Jan. 14, 2011) (citation omitted),

adopted sub nom. United States v. Chester, Criminal Action File No. 1:09-cr-320-

TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011).   Generalized discovery is

not a valid reason for seeking a bill of particulars, Colson, 662 F.2d at 1391 (citation

omitted); United States v. Davis, 582 F.2d 947, 951 (5th Cir. 1978),[5] and "[a] bill of particulars may not be used for the purpose of obtaining detailed disclosure of the government's case or evidence in advance of trial," Zellner, 2011 WL 530718, at *9 (citation omitted). Moreover, defendants are not entitled to a bill of particulars describing information which is already evident from other sources, such as elsewhere in the indictment or in discovery. United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) (citation omitted), modified on other grounds by, 801 F.2d 378 (11th Cir. 1986); see also Reddy, 2010 WL 3210842, at *5 (citation omitted). Further, "[w]hen a court analyzes the sufficiency of an indictment, it reviews the indictment as a whole and give[s] it a common sense construction." United States v. Mitchell, CRIMINAL CASE NO. 1:17-CR-122-LMM-LTW, 2019 WL 6462838, at *22 (N.D. Ga. June 25, 2019) (last alteration in original) (citation and internal marks omitted), adopted by 2019 WL 3854307, at *3 (N.D. Ga. Aug. 16, 2019).

The superseding indictment in this case provides the names of the alleged co-conspirators, the time frame of the conspiracy, and it sufficiently informs each co-conspirator of his or her specific offense conduct, as well as the overall object of the conspiracy, see generally [Doc. 126], which was "to obtain money and

---

[5] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

property, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts," [id. at 2]. The superseding indictment also tracks the statutory language of the offenses charged, informing Middleton and Wakefield of the essential elements of the offense. See [Doc. 126]. "The Eleventh Circuit has previously found that an indictment alleging such facts is sufficient," Mitchell, 2019 WL 6462838, at *23 (citing United States v. Williams, 181 F. App'x 945, 948-49 (11th Cir. 2006) (per curiam) (unpublished); United States v. Ramos, 666 F.2d 469, 474-75 (11th Cir. 1982)), and the government "need not prove that each defendant had knowledge of all details and phases of the conspiracy when the defendant knows the essential nature of the conspiracy," id. (citation omitted). Indeed, an "individual cannot escape guilt [of conspiracy] merely because . . . he [or she] played a minor role in the total scheme," and the government "does not have to prove that the defendant agreed to commit or facilitate each and every part of the substantive offense." Id. (first alteration in original) (citations and internal marks omitted). That is, "[a] defendant can be a co-conspirator even if he [or she] did not know all aspects or details of the conspiracy or all of the individuals involved, came into the conspiracy after it began and played only a minor role in the conspiracy," and "[i]t is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every state of the conspiracy," since "all that the government must

14

allege is an agreement or common purpose to violate the law and intentional joining in this goal by conspirators." Id. (citations and internal marks omitted).

Middleton and Wakefield request that the Court order the government to file a bill of particulars outlining the "object of the single conspiracy joined by all ten defendants," [Doc. 229 at 4; Doc. 234 at 3], however; they are "not entitled to a bill of particulars with respect to information which is already available through other sources such as the [superseding] indictment and discovery," Mitchell, 2019 WL 6462838, at *19 (citations omitted); see also United States v. Jackson, CRIMINAL ACTION FILE NO. 1:16-CR-427-AT-JKL-8, 2019 WL 7842416, at *3 (N.D. Ga. Aug. 29, 2019) (citation omitted), adopted by 2019 WL 6769233, at *2 (N.D. Ga. Dec. 12, 2019). Their request for the "means and manner by which each co-defendant conspired with the other named co-defendants to accomplish the object of the charged conspiracy," [Doc. 229 at 4; Doc. 234 at 3], is likewise not a proper purpose of a bill of particulars, United States v. Baitcher, Criminal Action File No. 1:11-CR-536-SCJ-AJB, 2013 WL 1501462, at *2 (N.D. Ga. Mar. 22, 2013) (footnote and citations omitted) ("A bill of particulars may be obtained to clarify an indictment, as long as it does not seek to determine in advance the government's proof."), adopted by 2013 WL 1501454, at *1 (N.D. Ga. Apr. 11, 2013); United States v. Wimbley, Criminal No. 11-0019-WS, 2011 WL 3204539, at *2 (S.D. Ala. July 27, 2011) (citations omitted) ("Defendants are not entitled to a bill of

particulars as a . . . comprehensive preview of the [g]overnment's trial proof or theories."); United States v. Perez, No. CR 106-029, 2006 WL 1737449, at *3 (S.D. Ga. June 19, 2006) (citation omitted) ("Nor is [a bill of particulars] intended to secure for the defense the government's explanation of its theory of the case."), adopted at *1, especially since here, the superseding indictment is "very exhaustive and legally sufficient," United States v. Bickers, CRIMINAL INDICTMENT. NO. 1:18-CR-98-SCJ-LTW, 2019 WL 7559292, at *8 (N.D. Ga. Sept. 17, 2019), adopted by 2019 WL 5587050, at *7 (N.D. Ga. Oct. 30, 2019), and described in detail the object and manner and means of the alleged fraudulent scheme, as well as the role of each co-conspirator in the scheme, see [Doc. 126].

The superseding indictment provides "sufficient information about the nature of the charges to enable [Middleton and Wakefield] to prepare for trial, to avoid unfair surprise, and to enable [them] to plead double jeopardy in the event of a later prosecution for the same offense." Bickers, 2019 WL 7559292, at *8 (citations omitted).  In short, Middleton and Wakefield "bear[] the burden of showing that the information requested is necessary and that [they] will be prejudiced without it so as to justify granting a bill of particulars," Jackson, 2019 WL 7842416, at *3 (citations and internal marks omitted), and they have failed to meet their burden with respect to the particulars sought by their motions.

Accordingly, Middleton and Wakefield's motions for a bill of particulars, [Docs. 229 & 234], are **DENIED**.

**B.** **Motions to Sever, [Docs. 230, 232, & 239]**

Middleton, Wakefield, and McFarland have filed nearly identical motions to sever, with each seeking a separate trial from their co-defendants. [Docs. 230, 232, & 239]. In particular, they argue that severance is warranted because "[a]dmission of otherwise inadmissible hearsay would violate [ their] [d]ue [p]rocess [r]ights"; that admission of co-conspirator Quarterman's drug crimes would violate their due process rights; and that a joint trial in this case would be unfair due to the danger of the "spill over" effect. [Doc. 230 at 4-10 (emphasis omitted); Doc. 232 at 3-9 (emphasis omitted); Doc. 239 at 3-8 (emphasis omitted)]. They each also argue that their trials should be severed from any co-defendant who has made statements that directly or indirectly inculpate them, pursuant to Bruton v. United States, 391 U.S. 123 (1968). [Doc. 230 at 10; Doc. 232 at 9; Doc. 239 at 8-9].

"When multiple defendants are indicted, joined offenses must be reviewed initially under the standard set forth under Fed.R.Crim.P. 8(b)." United States v. Jones, No. CR 109-073, 2009 WL 2920894, at *1 (S.D. Ga. Sept. 11, 2009) (footnote and citation omitted). "Once Rule 8(b) has been satisfied by the allegations in the indictment, severance is governed entirely by Fed.R.Crim.P. 14, which recognizes

that even proper joinder under Rule 8(b) may prejudice a defendant or the government." Id. at *2 (citing United States v. Lane, 474 U.S. 438, 447 (1986)); see also United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002). After consideration of the pleadings, the Court finds that joinder of the ten defendants in the superseding indictment was proper under Rule 8, and severance is not merited under Rule 14 on the present record.

    **1.**     *Joinder is proper under Rule 8*

"Joinder of parties and defendants under Rule 8 is designed to promote judicial economy and efficiency." United States v. Weaver, 905 F.2d 1466, 1476 (11th Cir. 1990). "Rule 8 'is broadly construed in favor of the initial joinder.'" Id. (citation omitted); see also Zafiro v. United States, 506 U.S. 534, 537 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); Hersh, 297 F.3d at 1241; United States v. Touchet, No. 3:07-cr-90-J-33HTS, 2008 WL 2025322, at *7 (M.D. Fla. May 9, 2008); United States v. Cameron, No. 06-20753-CR, 2007 WL 1696022, at *3 (S.D. Fla. June 12, 2007) (quoting United States v. Dominguez, 226 F.3d 1235, 1238 (11th Cir. 2000)), adopted at *1, aff'd in part sub nom. United States v. King, 285 F. App'x 649 (11th Cir. 2008) (per curiam) (unpublished). Indeed, Rule 8(b) "permits the joinder of [d]efendants in the same indictment if they are alleged to have participated in the same act or transaction, and the general rule is that [d]efendants indicted together should be tried together,

18

especially in conspiracy cases." <u>United States v. Chavez</u>, 584 F.3d 1354, 1359-60 (11th Cir. 2009) (citations and internal marks omitted).

Neither Wakefield, Middleton, nor McFarland have specifically argued that joinder under Rule 8(b) is improper in this case, <u>see generally</u> [Docs. 230, 232, & 239], and the Court finds that they were properly joined because the offenses charged in the superseding indictment involve the same series of acts or transactions pursuant to a common scheme, they share common co-conspirators alleged to have jointly committed the acts or transactions, and proof of the offenses will include testimony from some of the same witnesses, <u>see United States v. Brooks</u>, 270 F. App'x 847, 849 (11th Cir. 2008) (per curiam) (unpublished) (finding district court properly denied defendants' motions to sever where they were jointly indicted for the same conspiracy); <u>Jones</u>, 2009 WL 2920894, at *1 (joinder of defendants proper where defendants alleged to have participated in the same series of acts or transactions); <u>United States v. Bujduveanu</u>, No. 08-20612-CR, 2008 WL 4558696, at *1 (S.D. Fla. Oct. 10, 2008) (finding joinder under Rule 8(b) proper where defendants were jointly charged in the indictment of a single conspiracy).

### 2.   *Severance is not warranted under Rule 14*

Although joinder is appropriate under Rule 8, the Court still has discretion under Rule 14(a) of the Federal Rules of Criminal Procedure to sever these defendants and order separate trials if it appears that consolidation of the charges

would be prejudicial.  Fed. R. Crim. P. 14(a); United States v. Kopituk, 690 F.2d 1289, 1314-15 (11th Cir. 1982).  "In deciding a motion for severance, the Court must balance the right of a defendant to a fair trial against the public's interest in efficient and economic administration of justice."  United States v. Denmark, No. 205CR71FTM33DNF, 2005 WL 2755987, at *2 (M.D. Fla. Oct. 25, 2005) (citation and internal marks omitted).  "More specifically, the Eleventh Circuit has interpreted Rule 14 to require a [d]efendant seeking severance to demonstrate specific and compelling prejudice arising from a joint trial."  Id. (citing United States v. Leavitt, 878 F.2d 1329, 1340 (11th Cir. 1989)).  That is, the "prejudice standard envisioned by [R]ule 14 [] requires a showing of actual prejudice, not merely a showing that a defendant may have a better chance of acquittal in separate trials."  United States v. DeLeon, No. CR 15-4268 JB, 2017 WL 3054511, at *83 (D.N.M. June 30, 2017) (citation and internal marks omitted).  Middleton, Wakefield, and McFarland have not satisfied the standard to obtain severance under Rule 14.

Middleton, Wakefield, and McFarland first contend that severance is warranted because statements made by other co-conspirators, such as text messages between Quarterman and Lawson "related to [] loan applications" not involving them may be admitted during a joint trial, thereby violating their due process rights, whereas "much of this co-conspirator hearsay . . . would not be admissible" in a "separate trial from [] Quarterman and [] Lawson[.]"  [Doc. 230 at

4-5; Doc. 232 at 3-5; Doc. 239 at 3-4]. The government responds that while "[n]o specific statements were identified as a part of the motions," Middleton, Wakefield, and McFarland's characterization of "these co-conspirator statements as 'inadmissible hearsay'" is simply incorrect, since "a statement is not hearsay if offered against an opposing party and 'was made by the party's coconspirator and in furtherance of the conspiracy'" and the "text messages made by the various co-conspirators to each other in furtherance of the conspiracy are strong evidence that the various defendants willingly joined in and participated in the conspiracy" and therefore, the government's "intent [] to offer them against each defendant because they are probative of guilt" render the statements "not hearsay, . . . admissible, and . . . not a basis to sever the trial." [Doc. 254 at 3 (citations omitted)].

"[S]everance is not required if some evidence is admissible against some defendants and not others and a defendant is not entitled to severance because the proof is greater against a co-defendant." United States v. Jones, No. 1:06-CR-140, 2007 WL 712420, at *4 (E.D. Tenn. Mar. 6, 2007) (citations and internal marks omitted); see also United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) (citations omitted) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."). Pursuant to Rule 801 of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence

to prove the truth of the matter asserted," however, "[a] statement that is otherwise hearsay . . . may be offered for a permissible purpose other than to prove the truth of the matter asserted," and "[a] party opponent's statement is excluded from the definition of hearsay where[ t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." DeLeon, 2017 WL 3054511, at *92-93 (citations and internal marks omitted) (citing Fed. R. Evid. 801(d)(2)).

Other than referencing text messages between Quarterman and Lawson, Middleton, Wakefield, and McFarland have not identified any specific statements they contend constitute inadmissible hearsay, see [Doc. 230 at 4; Doc. 232 at 4; Doc. 239 at 3], and "[i]t is not clear that [any] statement[s are] inadmissible," and "[w]hile [the Court] reach[es] no final decision on this record, as the issue is more properly resolved in the context of an *in limine* motion, the statement[s] appear[] to be one[s] that [amount to statements in furtherance of a conspiracy], which [are] admissible," United States v. Bennett, 485 F. Supp. 2d 508, 514 (S.D.N.Y. 2007) (citation omitted).  Thus, "there is no risk of prejudice where . . . the evidence pointed to by [Middleton, Wakefield, and McFarland] would be admissible in separate trials against each defendant," since "evidence of the full nature and scope of a conspiracy is admissible even at the trial of lesser participants." United States v. Kahale, 789 F. Supp. 2d 359, 393 (E.D.N.Y. 2009) (citations and internal

marks omitted), aff'd sub nom. United States v. Graham, 477 F. App'x 818 (2d Cir. 2012) (unpublished).  And, "to the extent that there exists some greater quantum of proof implicating one defendant compared to another, this fact does not alone justify severance, for differing levels of culpability and proof are inevitable in any multi-defendant trial and, . . . are insufficient grounds for separate trials."  Id. (citations and internal marks omitted).

Pursuant to Rule 801(d)(2)(E), "for co-conspirator hearsay statements to be admissible, the government must show by a preponderance of the evidence that: (1) a conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy."  United States v. Mays, Case No. 1:14–cr–120–3, 2015 WL 4624196, at *6 (S.D. Ohio Aug. 3, 2015) (citation and internal marks omitted).  "As for the requirement that a co-conspirator statement be made 'in furtherance' of a conspiracy, [t]he touchstone of the 'in furtherance' requirement is that the statement be designed to promote the accomplishment of the conspiracy's goals."  United States v. Johnson, 469 F. Supp. 3d 193, 212 (S.D.N.Y. 2019) (alteration in original) (citations and internal marks omitted). Here, each defendant is charged in Count One of the superseding indictment with conspiracy, see [Doc. 126], and "[i]n a trial involving a conspiracy, statements by a coconspirator made in furtherance of a conspiracy are not hearsay and are

admissible against all coconspirators," United States v. Borish, 452 F. Supp. 518, 525 (E.D. Pa. 1978) (citations omitted); see also Bennett, 485 F. Supp. 2d at 514 (defendant acknowledging that "acts and statements by one coconspirator in furtherance of the conspiracy are properly admissible against all the members of the conspiracy").   Therefore, the arguments for severance based on alleged inadmissible hearsay are without merit.   United States v. Dowtin, No. 10 CR 657(SJ)(RML), 2012 WL 7679552, at *3 (E.D.N.Y. Nov. 20, 2012) (citation omitted) (finding that the "possibility of the introduction of evidence not directly related to [defendant] but admissible as an act of a co-conspirator in furtherance of the conspiracy does not warrant severance").

Middleton, Wakefield, and McFarland next contend that evidence that Quarterman "was arrested in connection with a drug investigation" in August 2020, which the "government may intend to admit . . . against Quarterman at a joint trial in this case, but [] would not be admissible against [ them] at a separate trial," would "unduly prejudice [ them]" and "would permit the jury to think that [they are] somehow involved in [] Quarterman's drug related activities."   [Doc. 230 at 5-6; Doc. 232 at 5; Doc. 239 at 4-5].   In response, the government agrees that "[t]here is not currently any evidence to suggest that Wakefield, McFarland, or Middleton are involved in Quarterman's drug activities" and that if "the fact that Quarterman's phone was searched as part of a drug investigation is admitted at

trial, it would be purely for contextual [purposes] to explain why law enforcement was looking in her cell phone," since the search of her cell phone is what led to the discovery of the activities brought forth in the superseding indictment. [Doc. 254 at 3-4]. The government also asserts that it "would not argue or imply that any of the other nine defendants were connected with Quarterman's drug trafficking and would support a special instruction to this effect." [Id. at 4]. It further asserts that it may be "possible to present to the jury the fact that Quarterman's cell phone was searched without ever referencing that the search was done incident to a drug investigation" and that "[i]n all likelihood, this would be the course of action that the United States would likely take." [Id.]. Thus, the government maintains that the "drug investigation into Quarterman is not a basis to sever the trial of Wakefield, McFarland, or Middleton." [Id.]. The Court agrees.

"The Eleventh Circuit has explained that [s]everance . . . is warranted only when a defendant demonstrates that a joint trial will result in 'specific and compelling prejudice' to his [or her] defense," and "[c]ompelling prejudice occurs when the jury is unable to separately appraise the evidence as to each defendant and render a fair and impartial verdict." United States v. Pasby, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-22, 2017 WL 10402560, at *9 (N.D. Ga. Oct. 4, 2017) (first and second alterations in original) (citations and internal marks omitted), adopted by 2018 WL 4953235, at *1 (N.D. Ga. Oct. 12, 2018). "Cautionary

instructions to the jury are presumed to adequately safeguard against prejudice." Id. (citation omitted). "Even assuming the admissibility at trial of evidence of [Quarterman's drug trafficking activities], [neither Middleton, Wakefield, nor McFarland] have . . . demonstrate[d] that the jury will not be able to compartmentalize the evidence against the various [d]efendants or apply that evidence in accordance with the jury charge, in which the court anticipates that the jury will be instructed to consider only the evidence offered against the [d]efendant in question." United States v. USPlabs, LLC, Criminal No. 3:15-CR-496-L, 2018 WL 5831478, at *15 (N.D. Tex. Nov. 7, 2018). Additionally, Middleton, Wakefield, and McFarland "have not persuaded the court that the potential prejudice they reference outweighs the [g]overnment's interest in judicial economy" or that it "should vary from the normal rule that defendants indicted together should be tried together." Id. (citation omitted).

Middleton, Wakefield, and McFarland further argue that severance is warranted because "[a]lmost all of the evidence at trial will be about the actions of Quarterman and Lawson and their decisions to recruit loan recipients, complete loan applications on their behalf, and collect 'fees' for their services," the evidence as to each of them "will largely consist of [their individual] text messages with Quarterman," but the "volume of evidence against the two lead defendants will inevitably spill over into the cases against [each of them], preventing [them ] from

receiving a fair trial," and that, at least as to Middleton and Wakefield, "the familial relationship" further complicates the issue and would make it "difficult for the jury to separate the familial relationships from the charged conspiratorial relationship." [Doc. 230 at 7-9 (citation omitted); Doc. 232 at 7-8; Doc. 239 at 6-7]. However, they are "charged together with several co-[d]efendants" and the "extent of [their] actual involvement, if any, with the[] conspirac[y] is . . . a factual matter for the jury, not a basis for severance." United States v. Pavlenko, No. 11–20279–CR, 2012 WL 222928, at *2 (S.D. Fla. Jan. 25, 2012) (citation omitted).  In short, the Court simply "disagrees that the risk of spill-over is too great" and "to the extent that any evidence is not pertinent to th[ese] particular [d]efendant[s], an appropriate limiting instruction to the jury can ameliorate any potential prejudice." Id. (citation omitted); see also United States v. Greenhill, CRIMINAL CASE NO. 1:18-CR-00108-MHC-JFK, 2018 WL 5659933, at *7 (N.D. Ga. Sept. 20, 2018), adopted by 2018 WL 5649898, at * 1(N.D. Ga. Oct. 31, 2018).[6]

---

[6] Middleton, Wakefield, and McFarland "also attach much significance to . . . the Eastern District of New York's decision in *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987), *aff'd*, 863 F.2d 185 (2d Cir. 1998)," United States v. Abbell, 926 F. Supp. 1545, 1551-52 (S.D. Fla. 1996); see also [Doc. 230 at 8-10; Doc. 232 at 7-9; Doc. 239 at 7-8], but "[t]he facts of *Gallo* are very different from those in the instant case," since in "*Gallo*, the court was faced with a conspiracy to participate in a multi-faceted enterprise," involving "at least nine areas of illegal activity, including murder, loansharking, and extortion," whereas here, "all of the defendants were

Finally, Middleton, Wakefield, and McFarland argue that their Sixth Amendment right to cross-examine adverse witnesses would be violated if they are tried with their co-defendants because "some defendants may have made statements to the government regarding this case," though they acknowledge that "[i]t is unknown at this time if any of those statements present an issue for severance under *Bruton*[.]"  [Doc. 230 at 10; Doc. 232 at 9; Doc. 239 at 8-9].  They therefore assert that "should the government produce statements by a co-defendant that inculpates [ them], [their] trial should be severed from such defendant so that they have ample opportunity to cross-examine that defendant regarding the statement."  [Doc. 230 at 10 (citation omitted); Doc. 232 at 9; Doc. 239 at 8-9].  The government responds that it "is not currently aware of any statements made by co-conspirators that might qualify under *Bruton*," but "if any arise (or currently exist), it is possible that at the time of trial, other defendants will have pled guilty and will be called as witnesses, mooting any possible *Bruton* issues" and that "[a]s such, the United States requests that the motion to sever pursuant to *Bruton* be denied without prejudice as moot," leaving open the "ability to re-file later should a true *Bruton* issue arise as trial approaches."  [Doc. 254 at 6-7].

---

allegedly working with the same purpose," <u>Abbell</u>, 926 F. Supp. at 1552 (citation and internal marks omitted).

"In *Bruton v. United States*, the Supreme Court held that a defendant's Confrontation Clause rights might be violated if, in a joint trial, a codefendant's statement or confession is admitted into evidence against the co-defendant, but the codefendant does not take the stand to permit the defendant's cross-examination."   Jones, 2007 WL 712420, at *3 (citing Bruton, 391 U.S. at 123). Severance, therefore, "might be appropriate if the [g]overnment intends to introduce into evidence a codefendant . . . statement, if such statement expressly implicates [d]efendant and if such co-defendant does not take the stand to permit cross-examination."   Id.   Because neither Middleton, Wakefield, nor McFarland have "identified any specific statement or testimony that might be offered at trial that would create a problem under *Bruton*, nor ha[ve they] identified any co-defendant who made a statement or whether such defendant is going to trial," at this time, "the Court is unable to evaluate the motion and the appropriateness of any remedial efforts that could be taken at trial to avoid a *Bruton* problem," and their motions to sever based on Bruton are due to be denied at this time.   Pasby, 2017 WL 10402560, at *9; see also United States v. Wilson, No. 10-60102-CR, 2010 WL 2609429, at *8 (S.D. Fla. June 5, 2010), adopted by 2010 WL 2612341, at *1 (S.D. Fla. June 25, 2010).   Middleton, Wakefield, and McFarland have failed to establish compelling prejudice such that the Court should exercise its discretion and grant a severance.   Accordingly, it is **RECOMMENDED** that Middleton, Wakefield, and

McFarland's motions to sever, [Docs. 230, 232, & 239], be **DENIED**, without prejudice to renew should any actual <u>Bruton</u> issue arise.

## C.   <u>Motions to Suppress Cell Phone Evidence, [Docs. 221 & 272]</u>

Lawson has filed a motion to suppress evidence, [Doc. 221], arguing that the Court should "suppress[] all evidence found on or derived from her cell phone" because of the "unnecessary delay between the warrantless seizure of her phone, the search warrant application, and the search itself," [<u>id.</u> at 1].[7]  In her post-hearing supplemental motion to suppress, [Doc. 272], Lawson also alternatively argues that the evidence "found on or derived from the search of her cell phone" should be suppressed because the "information contained in the warrant itself was too stale to justify the issuance of a search warrant," [<u>id.</u> at 1].  The government opposes Lawson's motions, [Doc. 281], and maintains that it "diligently obtained a warrant for the search of [her] cell phone" and that the "probable cause in the search warrant affidavit was not stale and was sufficient for issuance of the

---

[7] Lawson attached to her original motion to suppress the search warrant application and the warrant that was issued on March 31, 2021, authorizing the search of the subject cell phone.  <u>See</u> [Doc. 221-1].  Thereafter, Lawson filed a "Notice of Filing," [Doc. 244 (all caps omitted)], in which she asserted that her motion to suppress "referenced an 'Exhibit A,'" but that "the exhibit was unintentionally omitted from the filing," so she provided notice of the filing of "the same [m]otion to [s]uppress and Exhibit A," [<u>id.</u> at 1].  However, the exhibit was attached to her original motion, <u>see</u> [Doc. 221-1], so the Court will cite the original exhibit.

warrant," [id. at 7-13 (emphasis omitted)].  Lawson has filed a reply in support of her motions, [Doc. 288], and for the reasons that follow, Lawson's motions, [Docs. 221 & 272], are due to be denied.

**1.    Statement of Facts**

On March 16, 2021, Lawson was indicted, along with nine other individuals, in the Northern District of Georgia on charges of conspiracy to commit wire fraud, wire fraud, bank fraud, mail fraud, and money laundering.  See [Doc. 1]; see also (Tr. at 6, 8).  Inspector Daryl Greenberg ("Insp. Greenberg") of the United States Postal Inspection Service ("USPIS"), who was the sole case agent assigned to lead the investigation of this case, testified at the evidentiary hearing regarding the relevant events of the investigation surrounding the seizure of Lawson's cell phone and subsequent application for a warrant to search it.  See (Tr. at 4-64).

 Insp. Greenberg testified that, following the issuance of the original indictment, he "orchestrated a ten-person arrest operation simultaneously in five different states," (Tr. at 8-9); see also (Gov't Ex. 1),[8] and on March 18, 2021, Lawson, Quarterman, Wakefield, Montgomery, Middleton, Washington, Jones, and McFarland were arrested, (Tr. at 8, 11-12, 38).  Insp. Greenberg explained that

---

[8] Insp. Greenberg testified that he created Gov't Ex. 1, which is a chronological timeline of events, "so that [he] could accurately reflect the . . . amount of time and the activities in all the days that were in question[.]"  (Tr. at 9-11, 34).

leading up to the March 18, 2021, arrests, he learned that "there were some new PPP loans in 2021," which was significant to him because up to that point, he had believed "that the activity had stopped in[] August of 2020," but since it appeared that the activity was continuing into 2021, he advised the arresting agents in the five different states "to be on [the] lookout for evidence that would show the ongoing criminal activity since it did not stop when [he] originally thought it had stopped."  (Tr. at 7-8, 11); see also (Gov't Ex. 1).  On the day of the arrests, Insp. Greenberg was running the command center and documenting information as it came in, as well as trying to locate two of the indicted individuals whom the agents were unable to arrest that day and taking additional steps to secure seizure warrants for four bank accounts and three vehicles.  (Tr. at 12-13, 38-39); see also (Gov't Ex. 1).

Lawson was located and arrested at her residence in Houston, Texas, on the morning of March 18, 2021.  (Tr. at 13; Gov't Ex. 1).  During the arrest, the agents asked Lawson for her cell phone, which she provided and indicated that it was "dead," and in fact, had not been operational since around February 3, 2021, and she was then transported to a USPIS office in Houston to be interviewed.  (Tr. at 13, 63).[9]  On the following day, USPIS Inspector Matt Rintoul flew from Houston

---

[9] Law enforcement agents also asked Lawson for the password to unlock her cell phone, but she declined to provide that information.  (Tr. at 36).  Insp. Greenberg

to Atlanta with Lawson's cell phone and placed it into evidence, while Insp.

Greenberg was still attempting to locate T. Quarterman and K. Quarterman, both

of whom were eventually arrested that day, as well as serving the four bank

account seizure warrants.  (Tr. at 14, 36; Gov't Ex. 1).  Thereafter, on March 21,

2021, Insp. Greenberg started documenting and entering information into the case

management system from all of the arrests, and on the following day, he had

Lawson's phone transferred into his custody, and he was "made aware that []

Quarterman was currently trying to move funds out of certain bank accounts," so

he then "had to go down to Lovejoy . . . and pick up her jail phone calls from the

weekend" because he wanted to know who she "was talking to trying to have [her]

money moved while she was still currently in custody."  (Tr. at 14-16); see also

(Gov't Ex. 1).  He also became aware that "money [was] actively trying to be

moved out of . . . several [of] Lawson's accounts" and "trying to locate and lock

---

testified that because he had already seen text messages to Lawson that were on
Quarterman's cell phone, he was interested in seizing Lawson's phone because he
believed it to be "an integral part of the scheme" and that once he discovered that
there were additional fraudulent PPP loan applications in 2021, he instructed the
agents effectuating Lawson's arrest to seize her cell phone, but that he would not
have told them to do so if he had not discovered that there were additional
fraudulent loan applications in 2021 because he believed that "all the information
from 2020 would have been stale" and possibly not even on that phone since, in
his experience, "criminals tend to go through cell phones fairly quickly."  (Tr. at
54-57).

down th[e] money became a primary concern . . . during [this] time."  (Tr. at 15, 20-23, 32-33).

On March 23, 2021, Insp. Greenberg began working on the search warrant application for Lawson's cell phone, and he continued to work on the affidavit in support of the application, including making multiple revisions based on input he received from the prosecutors assigned to the case, until it was sent to a magistrate judge for review on March 30, 2021.  (Tr. at 17-19, 24-28; Gov't Ex. 1); see also (Tr. at 29, 32-33, 58-60).  During this same time, Insp. Greenberg also was working on various case-related issues, including completing case management documentation; coordinating with multiple banks to seize funds; preparing for and testifying at Quarterman's detention hearing; reviewing grand jury subpoena responses from certain banks, which led to the discovery that Lawson was withdrawing funds from accounts; and working on additional seizure warrants.  (Tr. at 17-21, 23-29, 32-33, 61-62; Gov't Ex. 1).  Insp. Greenberg's computer also crashed during this time, and he had to image his old laptop and reinstall all of the information onto his new laptop.  (Tr. at 25; Gov't Ex. 1).  He also testified that during this time, he had approximately eight to ten other cases and "items [came] up that [he] had to deal with and take time away from this case to deal with . . . on the other cases."  (Tr. at 27).

On March 30, 2021, the application for a search warrant for Lawson's phone was submitted to the Honorable Christopher C. Bly ("Judge Bly"), United States Magistrate Judge for the Northern District of Georgia, for review, and on March 31, 2021, Judge Bly signed the search warrant.  (Tr. at 27-28, 39; Gov't Ex. 1); see also [Doc. 221-1].[10]  In the affidavit submitted with the search warrant application, Insp. Greenberg first described the cell phone to be searched and his qualifications, [Doc. 221-1 at 2-3 ¶¶ 1-6], and then he summarized the alleged fraudulent scheme, including the activities that had taken place between July and August of 2020,  and explained that an "[e]xamination of Quarterman's cell phone revealed hundreds of pages of texts between Lawson and Quarterman during this time frame as they both sent and received information needed to apply for the EIDL and PPP loans and discuss[ed] other aspects of the scheme," [id. at 6-11 ¶¶ 20-36 (all caps omitted)].  Additionally, Insp. Greenberg reported, in relevant part:

> 37.   On March 16, 2021, Lawson, Quarterman, T. Quarterman, Wakefield, Washington, Jones, McFarland, K. Quarterman, Middleton, and Montgomery were indicted . . . . On March 18 and 19, 2021, Postal Inspectors conducted arrest operations on all 10 [d]efendants.
>
> 38.   Montgomery was arrested . . . and consented to a post-*Miranda* video recorded interview. . . . [He] also provided written consent to search his phone.  Montgomery confirmed exchanging text messages with Quarterman as recently as February 23, 2021 in which

---

[10] Insp. Greenberg also submitted additional applications for seizure warrants for Judge Bly's review, which were issued on March 31, 2021.  (Tr. at 50-51).

Quarterman and Montgomery were discussing a second PPP loan. The most recent text string includes Quarterman stating ". . . yours is still pending but I'll let you know when it goes through." Montgomery replied, "Thanks for the update."

39.  Additionally, recorded post-*Miranda* interviews of Middleton and Wakefield revealed that Quarterman had recently approached both of them about submitting a second PPP loan application in the same manner as the PPP loans submitted in July/August 2020.  Thus, it appears that Quarterman was still engaged in PPP loan fraud as recent as February or March 2021.

40.  On March 18, 2021, Lawson was arrested at her Houston, TX residence.  When Lawson was arrested, her cell phone was seized pending law enforcement obtaining a search warrant for it.  Lawson and the subject phone were transported to the USPIS office in Houston where Lawson consented to a post-*Miranda* video recorded interview.

41.  Upon completion of the interview, the subject phone was bagged into evidence . . . . The evidence bag was then secured and transported to the USPIS office in Atlanta, GA. . . .

44.  Starting on February 8 through February 19, 2021, the [American Airlines Credit Union ("AACU")] account[, of which Lawson is the sole owner,] received four wire/branch deposits from multiple states totaling $25,000.  One such wire deposit was made on February 19, 2021 from "Gwendolyn Scott" in the amount of $7000.  This deposit amount is consistent with the amount that Lawson and Quarterman were charging for PPP loans.  A search of the federal database that contains the names of all businesses/individuals that have received PPP loans reveals that an individual named Gwendolyn Scott applied for and received a PPP loan on February 14, 2021 in the amount of $20,757.  PPP loan records also show Gwendolyn Scott received approval for a PPP loan in the same amount on August 6, 2020.

. . . .

47.  On February 1, 2021, [Lawson's JP Morgan Chase Bank account xxx9283 ("JPMC 9283")] began receiving nine CashAPP and Zelle

wire deposits from multiple people mostly totaling $25,000.  These unexplained deposits were consistent in amounts and quantity as the "fees" split with Quarterman as part of the EIDL and PPP scheme. One such wire deposit was made to the JPMC 9283 acc[ount] on February 17, 2021 from "Clarence Singleton" in the amount of $3500 and another on February 18, 2021 for $500.  A search of the federal database that contains the names of all businesses/individuals that have received PPP loans reveals that an individual named Clarence Singleton received a PPP loan on February 13, 2021 in the amount of $20,660.

48.  PPP loan records also show Clarence Singleton received a PPP loan in the same amount on July 29, 2020.  Two days after receiving a PPP loan, according to bank records, Clarence Singleton deposited $3500 in the JPMC 9283 account of Lawson and deposited another $500 on July 31.

[Id. at 12-15 ¶¶ 37-41, 44, 47-48 (all caps omitted)]; see also (Tr. at 40, 43-49).  Insp. Greenberg explained that, based "upon the July to August 2020 modus operandi of Lawson and Quarterman, given the same or similar activity shown in Lawson's February 2021 bank records by people who ha[d] recently received PPP loans," he believed Lawson "was still obtaining fraudulent PPP loans in February 2021 for some of the same co-conspirators from July/August 2020 and other[s]."  [Doc. 221-1 at 15 ¶ 49 (all caps omitted)].  He further stated that, upon reviewing bank records, he had seen "multiple people send Lawson money directly" and that "[g]iven that it appear[ed] that Lawson continued to engage in fraudulent PPP loans through, at least, late February 2021 (and given that text messaging was the primary communication medium for recruiting co-conspirators and passing along information in July/August 2020), there [was] probable cause to believe Lawson

37

used the subject phone to further the fraudulent loan scheme right up until the day of her arrest." [Id. at 15-16 ¶ 51 (all caps omitted)]. Finally, Insp. Greenberg averred that cell phones have the capability to store text messages, emails, photographs, videos, and contacts, among other information, and that electronic devices such as cell phones can store this type of information "for long periods of time." [Id. at 16 ¶ 53, 19 ¶ 55].

Between the time agents seized Lawson's cell phone on March 18, 2021, until Judge Bly issued the warrant on March 31, 2021, no request was made for the return of Lawson's cell phone. (Tr. at 28). Insp. Greenberg testified that, "based upon the prior activity of July through August of 2020," as well as the information that "the exact same activity was occurring on new loans in January, February, and into March of 2021," and "the cell phones were integral in the first phase back in 2020 of how coconspirators not only talked about the scheme back and forth but how pictures and personal identifying information and pictures of driver's license[s] and bank statements were sent," he "believed that the same method of operation that was occurring in 2020 was occurring again in 2021 utilizing the same means." (Tr. at 29). He testified that a search of Lawson's cell phone pursuant to the warrant resulted in the discovery of incriminating evidence. (Tr. at 31).

Lawson moves to suppress the evidence obtained from the search of her cell phone, [Docs. 221 & 272], which the government opposes, [Doc. 281], and Lawson has filed a reply in support of her motions, [Doc. 288].  For the reasons that follow, Lawson's motions to suppress, [Docs. 221 & 272], are due to be denied.

### 2.    Analysis

### a.    *Delay in Seeking the Search Warrant*

Lawson, relying on <u>United States v. Mitchell</u>, 565 F.3d 1347 (11th Cir. 2009) (per curiam),  argues that the delay between the seizure of her cell phone on March 18, 2021, and the issuance of the search warrant on March 31, 2021, was unreasonable and that the "evidence obtained as a result of the search warrant was [therefore] in violation of [] [her] Fourth Amendment rights and must be suppressed."  [Doc. 221 at 2-5; Doc. 272 at 4-8].  In response, the government maintains that "[t]here are several factors that a reviewing court should use to determine the reasonableness of the delay," and that based on these factors, including that the "duration of the delay in obtaining the search warrant attributable to the [g]overnment was only 12 days, and Insp[.] Greenberg, the sole agent assigned to the case, diligently pursued the investigation," Lawson's "motion[s] to suppress should be denied" because Insp. Greenberg "did not unreasonably delay in obtaining the search warrant."  [Doc. 281 at 7-8, 10].

"The Fourth Amendment provides that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Brantley, 1:17-cr-77-WSD, 2017 WL 5988833, at *2 (N.D. Ga. Dec. 4, 2017) (alteration in original) (citation and internal marks omitted). "The Fourth Amendment generally requires that a warrant be issued upon probable cause before a search is conducted," but "[t]here are circumstances . . . that justify a search without a warrant, including searches incident to arrest." Id. (citations omitted). However, "[a] warrant is generally required before . . . a search [of a cell phone], even when a cell phone is seized incident to arrest," and "[a] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable searches." Id. (second and third alterations in original) (citations and internal marks omitted). "Thus, an initially lawful seizure may become 'unconstitutional if the police act with unreasonable delay in securing a warrant.'" Id. (quoting Mitchell, 565 F.3d at 1350).

Lawson has not challenged the initial seizure of her cell phone, see [Docs. 221 & 272]; rather, she contends that the delay between the seizure of the phone on March 18, 2021, and the issuance of the warrant on March 31, 2021, was too long, rendering the search pursuant to the warrant unconstitutional, [Doc. 221 at

2-5; Doc. 272 at 4-8]. "In determining whether a delay is unreasonable, the [C]ourt considers, on a case-by-case basis, all the facts and circumstances presented," and the Eleventh Circuit "has identified several factors highly relevant to this inquiry: first, the significance of the interference with the person's possessory interest, . . . second, the duration of the delay, . . . third, whether or not the person consented to the seizure, . . . and fourth, the government's legitimate interest in holding the property as evidence," and "[a]pplying these criteria here, the Court concludes the delay was not unreasonable." Brantley, 2017 WL 5988833, at *2 (second, third, and fourth alterations in original) (citation and internal marks omitted) (quoting United States v. Laist, 702 F.3d 608, 613-14 (11th Cir. 2012)); see also United States v. Shaw, 531 F. App'x 946, 949-50 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted).

The subject cell phone was seized from Lawson during her arrest on federal charges of conspiracy to commit wire fraud, wire fraud, bank fraud, mail fraud, and money laundering, [Doc. 1]; (Tr. at 13, 63).[11] At the time of her arrest, Lawson indicated that the phone was dead and not operational, (Tr. at 13, 63), so she "was not deprived of access to and use of the seized cellular telephone[]," and she also

---

[11] Although Lawson did not consent to the seizure of her cell phone, she has not challenged the seizure, and "the seizure was lawful," which "favors the [g]overnment." Brantley, 2017 WL 5988833, at *3.

never requested the return of the cell phone "during the period of delay," which "undermines [her] claim that [her] Fourth Amendment rights were impacted," Brantley, 2017 WL 5988833, at *2-3 (citations omitted); (Tr. at 28); see also Thomas v. United States, 775 F. App'x 477, 490 (11th Cir. 2019) (per curiam) (unpublished) (citations omitted) (considering fact that defendant never requested return of seized desktop during the 33 days it took to secure a search warrant as a factor in diminishing defendant's possessory interest in the desktop); United States v. Morgan, 713 F. App'x 829, 831 (11th Cir. 2017) (per curiam) (unpublished) (citing United States v. Johns, 469 U.S. 478, 487 (1985)) (explaining that because there was no evidence that defendant ever asked for his cell phone to be returned, his interest in the cell phone was diminished).  Thus, Lawson's "possessory interest in the cellphone was significantly diminished."  United States v. Turner, Case No. 8:18-cr-80-T-02JSS, 2019 WL 2287967, at *4 (M.D. Fla. May 29, 2019).  "Of course, even when a defendant's possessory interest in a [cell phone] is diminished, the government still must act diligently to obtain a search warrant," and "[s]everal facts bear on the government's diligence here."  Thomas, 775 F. App'x at 490 (citation omitted).

First, the twelve-day duration of the delay was "relatively short." Brantley, 2017 WL 5988833, at *3.[12] "Though the Eleventh Circuit noted in [Mitchell, 565 F.3d at 1352-53,] that three weeks could be too long, the court also recognized justifiable delay where some overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case, or where the resources of law enforcement are simply overwhelmed by the nature of a particular investigation, so that a delay that might otherwise be unduly long would be regarded as reasonable." Turner, 2019 WL 2287967, at *3 (internal marks omitted). Indeed, "[t]he same court, for example, upheld a twenty-five day delay where the defendant's possessory interest in the seized property was diminished and the agents involved were 'extremely busy.'" Id. (quoting Laist, 702 F.3d at 616-17). "The same considerations compel a finding of reasonableness here." Id.

In particular, Insp. Greenberg, the sole case agent assigned to lead the subject investigation, testified at the evidentiary hearing that following the seizure of the phone on Thursday, March 18, 2021, another agent flew back to Atlanta from Houston with the phone on Friday, March 19, but Insp. Greenberg was busy at the

---

[12] The proper period in determining whether the delay was reasonable is from March 18, 2021, the date of the seizure of the subject cell phone, to March 30, 2021, the date the warrant application was submitted. See Thomas, 775 F. App'x at 488 (citation omitted); see also United States v. Fernandez, CASE NO. 19-10022-CR-MARTINEZ/SNOW, 2020 WL 6470295, at *4 n.2 (S.D. Fla. Oct. 12, 2020), adopted by 2020 WL 6449190, at *1 (S.D. Fla. Nov. 2, 2020).

time still trying to locate and coordinate the arrest of two co-conspirators while also serving four bank seizure warrants related to the case, among other things. (Tr. at 6, 8-9, 14; Gov't Ex. 1).  He also explained that on that Sunday, he was busy entering all of the information from the ten-person arrests in five different states into the case management system, and that Lawson's cell phone was not transferred into his custody until that following Monday, March 22, at which time he also began listening to Quarterman's jail recordings and preparing to testify at her detention hearing.  (Tr. at 8, 14-16; Gov't Ex. 1).  Insp. Greenberg began working on the search warrant for Lawson's cell phone on Tuesday, March 23, 2021; however, he was also still coordinating with multiple banks regarding the seizure of funds and executing seizure warrants for bank accounts and vehicles, which had become particularly pressing after he learned that both Quarterman and Lawson allegedly were actively attempting to move funds from their accounts.  (Tr. at 15-17, 20-23, 32-33; Gov't Ex. 1).  Insp. Greenberg continued to work on the affidavit for the search warrant for Lawson's cell phone while also working on other matters related to this case, as well as putting out "small fires" in some of his other cases, and he sent the first draft of the affidavit to the Assistant United States Attorney ("AUSA") for review on March 25; he made revisions to it based on input from the AUSA on March 26 and added additional information learned from interviews and recently obtained bank records and sent the draft

back to the AUSA for review on March 29; he made further revisions and finalized the draft and sent it back to the AUSA on March 30, at which time the application was presented to Judge Bly, who signed the search warrant on March 31.  (Tr. at 24-28; Gov't Ex. 1).

"[T]he government has demonstrated compelling justification for the delay in seeking and obtaining the search warrant."  United States v. Todd, CR 416-305, 2017 WL 1197849, at *12 (S.D. Ga. Feb. 10, 2017), adopted by 2017 WL 1172113, at *1 (S.D. Ga. Mar. 29, 2017).  Indeed, Insp. Greenberg "testified to diligently working  . . . on preparing the search warrant affidavit," despite having to deal with other urgent matters related to this case, and in his other cases, and "[i]n light of these circumstances, the delay in presenting the warrant application is reasonable." Id.  Despite Lawson's reliance on Mitchell to support her contention that the delay in this case was unreasonable, see [Doc. 221 at 3-4; Doc. 272 at 6-8; Doc. 288 at 1-3], this "case is distinguishable from Mitchell, in which the Eleventh Circuit held a twenty-one day delay in obtaining a warrant to search a hard drive seized from a home computer was unreasonable under the circumstances," Todd, 2017 WL 1197849, at *13 (citation omitted).

In Mitchell, "law enforcement executed a 'knock and talk' warrant at the residence of the defendant, who at that time was a 'possible target' in a child pornography investigation," and while at the residence, "agents seized a hard

drive from the defendant's computer acting on probable cause that the drive contained evidence of child pornography." United States v. Covington, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-15, 2017 WL 10410076, at *7 (N.D. Ga. Oct. 5, 2017) (citation omitted), adopted by 2018 WL 5016499, at *1 (N.D. Ga. Oct. 16, 2018). Subsequently, the "agent in Mitchell attended a two-week training program which he could have delayed, and postponed applying for a warrant because he felt there was no need to get a search warrant until he returned" and he therefore "did nothing to prepare the warrant during the two and one-half days between the seizure of the hard drive and his departure for the training program." Todd, 2017 WL 1197849, at *13 (alterations, citation, and internal marks omitted). "In sum, the Eleventh Circuit found [n]o effort was made to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush." Id. (alteration in original) (citation and internal marks omitted).

"The circumstances in Mitchell simply led to a different consideration of facts under circumstances different from those in this case." Brantley, 2017 WL 5988833, at *3. In fact, "the Eleventh Circuit emphasized that the test requires applying a rule of reasonableness that is dependent on all of the circumstances" and "[l]ooking at all of the circumstances surrounding the [p]hone [w]arrant, it does not run afoul of Mitchell." United States v. Boyzo-Mondragon, CASE NO.

1:19-CR-00115-TWT-LTW, 2021 WL 1381155, at *10 (N.D. Ga. Feb. 5, 2021) (citation and internal marks omitted), adopted by 2021 WL 1379238, at *1 (N.D. Ga. Apr. 9, 2021), and adopted sub nom. <u>United States v. Mateo</u>, CRIMINAL FILE NO. 1:19-CR-115-2-TWT, 2021 WL 1379369, at *1 (N.D. Ga. Apr. 9, 2021).  In contrast to the circumstances present in <u>Mitchell</u>, Lawson "was not merely a 'possible target' in a government investigation" as she "had been indicted on [federal ] charges of [] conspiracy," among other charges, <u>Covington</u>, 2017 WL 10410076, at *7, and  Insp. Greenberg "did not just sit on his hands," and "it is clear that the delay in this case was not the result of complete abdication of his work or failure to see any urgency," <u>Thomas</u>, 775 F. App'x at 491 (citation and internal marks omitted).  "The standard is within a reasonable time," and "[u]nder all the circumstances, [Insp. Greenberg] met that standard here."  <u>United States v. Hill</u>, Case No. 5:18cr8-RH, 2018 WL 3352658, at *4 (N.D. Fla. July 9, 2018).

Furthermore, the "fourth factor strongly weighs in the [g]overnment's favor, because it had a legitimate interest in holding the properly as evidence." <u>Brantley</u>, 2017 WL 5988833, at *3 (citation and internal marks omitted).  Lawson was charged with conspiracy to commit wire fraud, wire fraud, bank fraud, mail fraud, and money laundering, <u>see</u> [Doc. 1]; <u>see also</u> [Doc. 126], and Insp. Greenberg testified that cell phones "were integral in the first phase back in 2020 of how coconspirators not only talked about the scheme back and forth but how pictures

and personal identifying information and pictures of driver's license[s] and bank statements were sent back and forth via text messaging and e-mails on cell phones, as well as [he] saw that money was being transferred through mobile applications on cell phones" and that he "saw and had every reason to believe the exact same activity was occurring on new loans in January, February, and into March of 2021" and that the coconspirators were "utilizing the same means," (Tr. at 29). He also testified that Lawson was considered "the head of the snake" in what was a "complex" scheme "showing almost 250 individuals involved" and that law enforcement agents therefore had a "legitimate interest in holding [Lawson's] cell phone as evidence[.]" (Tr. at 29-31). Thus, the "government [] had a strong interest in retaining the phone[], given the nature of the charges in this case[.]" Covington, 2017 WL 10410076, at *8. In sum, "[a]pplying the *Laist* factors to the record before the Court, the Court concludes that the time period between law enforcement's seizure of [Lawson's cell phone] and its obtaining a search warrant was not so unreasonable to justify suppression." Id.; see also Fernandez, 2020 WL 6470295, at *5 (finding that, after "[e]valuation of the[ Laist] factors [], . . . the [d]efendant's possessory interest in the [device] was minimal, the delay was only moderate and [the a]gent['s ] efforts to prepare and present the warrant application were diligent" and that "[d]efendant's Fourth Amendment rights were not violated by the 17-day delay . . . in obtaining the [s]earch [w]arrant"). Accordingly, Lawson's

motions to suppress cell phone evidence, [Docs. 221 & 272], are due to be denied on this basis.

> **b.** *Staleness*

In her post-hearing supplemental motion to suppress, Lawson argues for the first time that "the information in the search warrant affidavit was too stale to justify the search of [ her] phone."  [Doc. 272 at 8].  In particular, Lawson argues that because the affidavit "contains information about text messages allegedly sent by [] Quarterman to others in February, 2021," but "no further allegations about any phone calls or text messages sent to or from [] Lawson" and only "contains allegations about deposits received into [] Lawson's bank accounts that the government alleges are consistent with the 'fees' [] Lawson and [] Quarterman charged to others for helping with the PPP and EIDL loans," the "affidavit does not contain any information to support a finding that it is likely that [] Lawson's phone will still have evidence of the specified crime on it," since "[t]here's no reference to phone records, or text messages that were more current than August of 2020."  [Id. at 10].  The government responds that Lawson presents "a new argument that was not in [her] original motion at the time that the evidentiary hearing was held" and that her "motion supplement with regard to staleness should be denied as untimely" for this reason.  [Doc. 281 at 11 & n.3].  The government also responds that even if the Court considers this argument, the

"affidavit presented historical facts along with current facts to demonstrate probable cause that evidence relevant to the investigation would be found in [Lawson's] cell phone" and that the "probable cause outlined in [Insp.] Greenberg's application was not stale and was sufficient for issuing of the search warrant."  [Id. at 12-13].  In her reply brief, Lawson maintains that while "[i]t is true that this issue was not raised in [ her] initial motion to suppress," this Court "has the inherent authority to allow [ her] to raise [the] issue . . . at this time," especially since the "issue of staleness is one that is decided from reviewing the four corners of the search warrant affidavit and does not require an evidentiary hearing."  [Doc. 288 at 5-6 (footnote omitted)].  While the Court "agrees that [Lawson] has not properly raised [this issue] . . . as a basis for suppression," it will put "aside the untimeliness of [Lawson's] challenge to the warrant," as it finds her argument that information contained in the search warrant affidavit was stale "is without merit."  Covington, 2017 WL 10410076, at *7.

The Eleventh Circuit has explained judicial review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the [g]overnment's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of

the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.  In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).   "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."  United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013) (citation omitted), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013).  That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime."  United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted).  "The same reasoning applies to the instant search warrant in determining whether the affidavit establishes a nexus between the contents of the cellular telephone and the [crimes ] for which [Lawson] was arrested."  United States v. Coleman, CRIMINAL CASE NO. 1:18-CR-00484-ELR-JFK, 2020 WL 5229042, at *12 (N.D. Ga. Jan. 14, 2020), adopted by 2020 WL 2538931, at *1-2 (N.D. Ga. May 18, 2020).  "The affidavit need not establish direct observation of use of the cellular telephone to facilitate the criminal conduct;

instead, the 'fair probability' that the contents of the cellular telephone may contain evidence of the crime may be established from the affiant's expectation, based on prior experience and the specific circumstances of the alleged crime[.]" Id. (alteration in original) (citations and internal marks omitted).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner[.]"   Miller, 24 F.3d at 1361 (citation omitted).   Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."   Id. (citation omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014). "Furthermore, '[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.'"   United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 (N.D. Ga. Aug. 4, 2015) (alterations in original) (quoting United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)), adopted at *5; see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).

The Supreme Court has recognized that "[c]ell phones have become important tools in facilitating coordination and communication among members

of criminal enterprises, and can provide valuable incriminating information about [] criminals." Riley v. California, 573 U.S. 373, 401 (2014). "Indeed, it takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone." United States v. Kendricks, CRIMINAL ACTION FILE NO. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016) (citations omitted), aff'd, 723 F. App'x 950 (11th Cir. 2018) (per curiam) (unpublished). Considering the totality of these circumstances, the Court finds that there was a fair probability that evidence of the crime would be found in Lawson's cell phone. United States v. Lopez, 649 F.3d 1222, 1245 (11th Cir. 2011) (citation omitted).

Contrary to Lawson's contention, [Doc. 272 at 8-11], the information provided in Insp. Greenberg's affidavit was not stale, see [Doc. 221-1]. "For probable cause to exist . . ., the information supporting [] the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant." United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) (citations omitted); see also United States v. Sanders, No. 1:12-cr-373-WSD-ECS, 2013 WL 3938518, at *2 (N.D. Ga. July 30, 2013) (citations omitted); United States v. Bushay, 859 F. Supp. 2d 1335, 1378 (N.D. Ga. 2012), adopted at 1355 (citations omitted). "There is no particular rule or time limit for when information becomes stale." United States v. Bervaldi, 226 F.3d 1256,

1265 (11th Cir. 2000) (citations omitted).  Instead, "[t]o evaluate staleness claims, [the Court] look[s] at the unique facts of each case and may consider the maturity of the information, the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched."  United States v. Deering, 296 F. App'x 894, 898 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. Rojas-Coyotl, Criminal Action No. 1:13-cr-0128-AT-AJB, 2014 WL 1908674, at *5 (N.D. Ga. May 13, 2014) (citation omitted), adopted at *1.  "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time"; on the other hand, "if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance."  United States v. Bemka Corp., 368 F. App'x 941, 943 (11th Cir. 2010) (per curiam) (unpublished) (alteration in original) (citations and internal marks omitted).

In his affidavit, Insp. Greenberg detailed the alleged conspiracy, the participants, and how the scheme operated, including that the scheme largely operated via the exchange of text messages and photos over cellular telephones, as well as the exchange of funds via mobile payment applications from July through August 2020, including that "[e]xamination of Quarterman's cell phone revealed hundreds of pages of texts between Lawson and Quarterman during this

time frame as they both sent and received information needed to apply for the EIDL and PPP loans and discuss[ed] other aspects of the scheme."  [Doc. 221-1 at 6-11 ¶¶ 20-36 (all caps omitted)].   Insp. Greenberg then detailed additional information learned through post-indictment interviews, as well as from an analysis of Lawson's bank records, including that Quarterman continued to exchange text messages with other co-conspirators regarding submitting additional PPP loan applications in February and March 2021 and that Lawson received wired funds into accounts solely owned by her in February 2021 in amounts that were consistent with the amounts she and Quarterman were charging for PPP loans and consistent with activity that took place in 2020.  [Id. at 12 ¶¶ 37-39, 13-15 ¶¶ 42-48].   Insp. Greenberg also explained that cell phones stored text messages, e-mails, photos, videos, and other information, and that this information could be stored for "long periods of time."   [Id. at 16 ¶ 53a., 19 ¶ 55]. He therefore concluded that, "[b]ased upon the July to August modus operandi of Lawson and Quarterman, given the same or similar activity shown in Lawson's February 2021 bank records by people who ha[d] recently received PPP loans," Lawson "was still obtaining fraudulent PPP loans in February 2021 for some of the same co-conspirators from July/August 2020 and other[s]," and that through bank records, he had seen "multiple people send Lawson money directly" and "[g]iven that it appear[ed] that Lawson continued to engage in fraudulent PPP loans

through, at least, late February 2021 (and given that text messaging was the primary communication medium for recruiting co-conspirators and passing along information in July/August 2020), there [was] probable cause to believe Lawson used the subject phone to further the fraudulent loan scheme right up until the day of her arrest." [Id. at 15-16 ¶¶ 49, 51 (all caps omitted)].

The Court is persuaded that the ongoing nature of the alleged fraud, facilitated through electronic communications, together with the nature of the property being searched, "overcomes any alleged staleness in the information in the affidavit." United States v. Acosta, 807 F. Supp. 2d 1154, 1228 (N.D. Ga. 2011); see also United States v. Soviravong, CRIMINAL ACTION NO. 1:19-cr-146-AT-CMS, 2019 WL 7906186, at *5 (N.D. Ga. Dec. 2, 2019) (citations omitted) ("In cases involving digital media, courts have found that much longer periods of time than the affidavits at issue in this case did not render information stale."), adopted by 2020 WL 709284, at *1 (N.D. Ga. Feb. 12, 2020); United States v. Sadiki-Yisrael, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-3, 2018 WL 5091914, at *6 (N.D. Ga. May 24, 2018) (citation omitted) (finding "the nature of the evidence sought in th[e] warrant—including computer and digital evidence—weigh[ed] against a finding of staleness"), adopted by 2018 WL 5085687, at *1 (N.D. Ga. Oct. 18, 2018); Sanders, 2013 WL 3938518, at *8 (alterations in original) (citation omitted) ("'Although most of the information contained in the affidavit referred

to events which took place over two years before [the federal agent] applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted criminal conspiracy . . . . Because the affidavit alleged ongoing activity and a continuing relationship between the coconspirators, the information was not fatally stale.'"); United States v. Miller, Criminal Action No. 4:11–CR–0044–RLV–WEJ, 2012 WL 1606043, at *5 (N.D. Ga. Mar. 26, 2012) (rejecting defendant's argument that because the most recent event cited in agent's affidavit occurred five months prior to the date the warrant was issued, the affidavit contained stale information, given the ongoing nature of the crime), adopted by 2012 WL 1610129, at *1 (N.D. Ga. May 7, 2012); United States v. Coon, No. 10-CR-110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) (citations omitted) (explaining that "many courts have suggested that the staleness issue in the context of digital evidence is somewhat unique, and the passage of time does not necessarily render the evidence stale"). In short, "the nature of the criminal activity being investigated supported a finding of timeliness" as "[t]his was not a search for ephemeral evidence of a single discrete criminal act," but rather, this "was an ongoing financial conspiracy" and "[c]ommon sense suggests that these things are not so easily dissipated especially given the continual nature of the conspiracy." United States v. Kellogg, Criminal Action No. 1:12–CR–383–1–CAP, 2013 WL 3991956, at *16 (N.D. Ga. Aug. 1, 2013). "The events in the affidavit did not require a finding

57

of staleness," id., and therefore, Lawson's staleness argument is without merit. Accordingly, it is **RECOMMENDED** that Lawson's motions to suppress, [Docs. 221 & 272], be **DENIED** as to the search of her cell phone.

### III.   CONCLUSION

For the foregoing reasons, Middleton and Wakefield's motions for a bill of particulars, [Docs. 229 & 234], are **DENIED**; it is **RECOMMENDED** that Middleton, Wakefield, and McFarland's motions to sever, [Docs. 230, 232, & 239], and Lawson's motion to suppress and supplemental motion to suppress cell phone evidence, [Docs. 221 & 272], be **DENIED**; and Wakefield, Middleton, and McFarland's motions to suppress statements, [Docs. 231, 235, & 238], are deemed to have been abandoned, and the Clerk is therefore **DIRECTED** to terminate these motions.[13]

**IT IS SO ORDERED**, **RECOMMENDED**, and **DIRECTED** this 2nd day of February, 2022.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[13] The motion to dismiss the indictment due to selective prosecution, [Doc. 228], if perfected, will be addressed in a separate Report and Recommendation after rulings on the pending objection, [Doc. 291], to the order denying the motion to compel discovery, [Doc. 278], and supplemental motion to compel discovery, [Doc. 294].